IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| KAREN LORETTA CHRISTIAN, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CAROLYN W. COLVIN, | : |
| Acting Commissioner, | : |
| Social Security Administration, | : |
| | : |
| Defendant. | : |
| | : |

Action No. 4:15-cv-41

## REPORT AND RECOMMENDATION

Plaintiff Karen Loretta Christian ("Ms. Christian") filed a complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner"), denying Ms. Christian's claim for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. Both parties have filed motions for summary judgment, ECF Nos. 14 and 16, which are now ready for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 11. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Ms. Christian's Motion for Summary Judgment, ECF No. 14, be **DENIED**; the Acting Commissioner's Motion for

Summary Judgment, ECF No. 16, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

On September 28, 2011, Ms. Christian filed an application for DIB, alleging a disability onset date of March 25, 2010, due to hypertension, coronary artery disease, diabetes, neuropathy, retinopathy, osteoarthritis, anemia, asthma, obesity, and depression. R. 181-87.[1] Ms. Christian's date last insured ("DLI") is December 31, 2015. *Id.* at 31.[2] The application was initially denied on April 27, 2012, *id.* at 111-28, and denied again upon reconsideration on December 14, 2012, *id.* at 73-98. Ms. Christian requested a hearing in front of an Administrative Law Judge ("ALJ"), *id.* at 137-38, which was held on October 10, 2013, *id.* at 44-65. The ALJ issued his decision on November 22, 2013, denying Ms. Christian's application. *Id.* at 29-39. The Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Ms. Christian's request for review of the ALJ's decision on March 13, 2015. *Id.* at 16. After exhausting her administrative remedies, Ms. Christian filed her Complaint for judicial review of the Acting Commissioner's final decision on May 18, 2015. ECF No. 3. The Acting Commissioner filed an answer on July 16, 2015. ECF No. 8. Both parties filed motions for summary judgment, ECF Nos. 14 and 16, and the matter is now ripe for adjudication.

---

[1] "R." refers to the certified administrative record that was filed under seal on July 16, 2015, ECF No. 9, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

[2] A claimant is only eligible for disability insurance benefits if found to be disabled on or before her DLI. *See* 42 U.S.C. § 423; 20 C.F.R. § 404.130; *Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005). Thus, to receive benefits, Ms. Christian must be found to have become disabled on or before December 31, 2015.

## II. RELEVANT FACTUAL BACKGROUND

In her application, dated September 28, 2011, Ms. Christian alleged a disability onset date of March 25, 2010. R. 181-87. At the time of the ALJ's decision, Ms. Christian was fifty-five years old, three hundred pounds, and had past work experience as a Licensed Practical Nurse ("LPN"). *Id.* at 35. At the hearing October 10, 2013, Ms. Christian provided the following testimony:

Ms. Christian began by summarizing the pains and ailments that kept her from working full-time:

> . . . I have pains in my feet from where I have pins and rods in one leg, which now has arthritis in it. I had a heart attack and stents put in. . . . [T]he peripheral vision in my right eye is pretty much messed up. I can't drive anymore due to the swelling in my feet and the peripheral vision in my eye being messed up. I have problems with my hands, which I can't hold things or uncap bottles. I can't stir. . . . I get cramps in my legs, due to the neuropathy and tingles in my – pains in my feet, my elbows and my arms. And my back Is pretty much getting the arthritis in it now, where I can't hardly sit down or stand up. Mostly laying down and that's mostly you know what happens.

*Id.* at 48. She further described the pain in her legs and feet as "shooting pain." *Id.* Ms. Christian stated that the swelling in her feet is likely due to the neuropathy, but some of it was caused by her blood pressure medication. *Id.* at 49. Her fingers, especially on the right hand, tend to cramp, making it hard to grasp and unscrew items. *Id.* at 49-50.

Ms. Christian described her typical day as starting off "stiff from the night before," requiring her to sit on the side of the bed for about twenty to thirty minutes before she can get into the shower. *Id.* at 50. Her husband helps her into the shower, helps her put on clothes, and cooks breakfast for the two of them. *Id.* at 50-51. The only bathroom in the house appears to be upstairs, and Ms. Christian stated that the majority of the time she stays upstairs because she cannot get up the steps fast enough to use the bathroom. *Id.* at 51. After she eats breakfast and

takes her medicine, she "fall[s] out" because the medication makes her "sleepy." *Id.*   For

hobbies, Ms. Christian testified that she reads a lot and occasionally she will leave the house if

her daughter or son drives her, and will attend church two times per month or go out to eat with

her husband. *Id.* at 51-52, 54. As for household chores, Ms. Christian testified that she can fold

laundry, but cannot put it away, and can wash some dishes, but cannot do any yard work or

general household cleaning. *Id.* at 52.

Ms. Christian testified that she can only walk about half a block before having to stop due

to shortness of breath in addition to pain in her back and ankle. *Id.* at 55. She also stated that

she can only stand for a total of five minutes before her back starts "killing" her, but that she can

sit for about twenty minutes. *Id.* She can lift a two-liter bottle of soda, but cannot lift a gallon of

milk or her nine-pound grandson. *Id.* at 56.

Emotionally, Ms. Christian testified that she has "anxiety and depression mostly

everyday" because she "is always afraid that something's going to happen," especially with her

health. *Id.* at 56-57. Specifically she stated she has anxiety attacks about three to four times a

week. *Id.* at 57.

Regarding Ms. Christian's heart, she had a stent put in around 2007 because she was on

medication called "Actos," which led to a congestive heart failure problem. *Id.* at 58. Though

her testimony was unclear, it appears she may have had a heart attack in both January and

September of 2011. *Id.*

When asked why she stopped working, Ms. Christian responded that she spent too much

time in the hospital because she kept getting sick, and was fired for her poor attendance record.

*Id.* at 59. Specifically, her legs kept swelling, which inhibited her from walking much and

prevented her from working as an LPN. *Id.* at 59-60. When she initially stopped working she

tried to go to school online, but could not finish the online course because of some issue with her hands. *Id.* at 60-61.

According to her medical records, Ms. Christian was fifty-one years old at her disability onset date. *Id.* at 38.

On October 18, 2007, Ms. Christian saw Dr. John P. Parker, M.D. ("Dr. Parker") at the Sentara Heart Hospital and had a stent inserted in the right coronary artery. *Id.* at 315. She returned in December of 2009 with for bouts of chest pain after having "done reasonably well" for two years. *Id.* at 315-16. Dr. Parker conducted a cardiac catheterization and percutaneous coronary intervention, which revealed "a small but stented right coronary artery, a significant lesion in the left anterior descending coronary artery[,] and a borderline lesion in the circumflex coronary artery." *Id.* Dr. Parker directed her to return for stent placement in the left anterior descending artery. *Id.* Dr. Parker also explained to Ms. Christian that cardiac catheterization (stent insertion) was the safest option to relieve her chest pain because at the time she was "severely obese," and "[n]oninvasive testing would be problematic." *Id.* at 317. Dr. Parker inserted a new stent into the left anterior descending artery. *Id.* at 319-22.

On September 15, 2011, Ms. Christian saw Dr. Derrick Ridley, M.D. ("Dr. Ridley") for a cardiology consultation. *Id.* at 426. Dr. Ridley reported that in the spring of 2011, Ms. Christian experienced significant dysfunction regarding "Effient," her heart disease medication. *Id.* She presented to Dr. Ridley "with complaints of chronic fatigue and exertional dyspnea that also seems to be chronic in nature." *Id.* Ms. Christian reported to Dr. Ridley that "[d]uring heart failure symptoms[,] she self-treats by increasing Lasix to two to four tablets daily for several days then decreases back to 20 mg daily once symptoms resolve." *Id.* Ms. Christian's recollection of her personal history stated at the time she had a metal stent inserted in December

of 2009 and a drug-eluting stent inserted in December of 2010. *Id.* at 427. She also reported having a myocardial infarction, or heart attack, in January of 2011. *Id.* at 425. According to the consultation report, Ms. Christian was on twenty-one "current medications" at the time of this appointment. *Id.* at 428. After a physical exam, Dr. Ridley indicated that Ms. Christian's heart had "no cardiomegaly or thrills[,] regular rate and rhythm, [and] no murmur or gallop." *Id.* at 429. However, Dr. Ridley found that Ms. Christian had heart failure, uncontrolled hypertension, hypercholesterolemia, diabetes, asthma, and obesity. *Id.* Upon recommendation, Dr. Ridley instructed Ms. Christian to begin a new medication regime, and to start a "low sodium, low cholesterol, low carbohydrate diet," and advised her to "reduce her overall caloric intake and to exercise as tolerated to achieve and maintain a healthy body weight." *Id.* at 429-30.

On September 21, 2011, Ms. Christian had a diagnostic x-ray because of pain in her lower back and ankle. *Id.* at 554. Results of her back showed no fracture or dislocation, but showed mild spinal arthritis. *Id.* Results of her ankle also showed no fracture or dislocation, but showed some soft tissue swelling. *Id.* at 558.

On October 13, 2011, Ms. Christian followed up with Dr. Ridley. She had no complaints related to chest pain, pressure, or tightness. *Id.* at 455. He prescribed another dosage of Effiant for her heart disease and encouraged her to attend diet counseling. *Id.* at 458.

On November 4, 2011, Ms. Christian saw Dr. Ridley with complaints of insomnia. *Id.* at 332. Ms. Christian indicated that four nights out of the week she only slept two hours before waking up. *Id.* Ms. Christian also indicated she experienced hot flashes, and Dr. Ridley suggested that her insomnia and hot flashes may be menopause-related. *Id.* at 332-33. Upon a physical exam, Dr. Ridley found that Ms. Christian was "oriented to person, place, and time and well-developed, well —nourished, and in no distress." *Id.* at 333. She had a normal range of

motion in the neck with regular hear rate and rhythm. *Id.* She also appeared to have a normal gait and no tenderness, and her mood, memory, affect, and judgment were normal. *Id.*

On December 10, 2011, Ms. Christian filled out a Pain Questionnaire for the Social Security Administration ("SSA"). *Id.* at 243. Ms. Christian reported that she had pain in her lower back, neck, knees, right hip and ankle, hands, and right elbow. *Id.* She also stated that the pain moves all over her body and worsens when the weather is cold. *Id.* Ms. Christian also indicated that she takes Tramadol four times per day, Vicodin two times per day, and another pain killer, all of which were prescribed to her in December of 2011. *Id.* at 245. In describing her daily activities, Ms. Christian stated that she showers, dresses, and takes medications. *Id.* at 246. She also attempts to walk around the house or cook and clean when she is having a good day. *Id.* In response to "How do you handle stress?," Ms. Christian responded, "I handle stress good [sic] it takes a toll on my physical body." *Id.* at 247. Socially, Ms. Christian described that she no longer felt comfortable around people and felt like she did not have much to talk about. *Id.* at 248. She stated that she bought food, clothes, and household items online and managed bills, money, and bank accounts. *Id.* at 249. As for personal care, Ms. Christian stated she had no problems bathing, shaving, or using the toilet, but that she had trouble using buttons, brushing her hair, and lifting heavy plate ware.

On January 1, 2012, Ms. Christian saw Dr. Brooks with complaints of congestion, headaches, and leg and hip pain. *Id.* at 504. She felt mild anxiety, but had an improved mood regarding her menopause. *Id.* She reported hurting constantly in her joints, and was worried that if she got a job again she would have "to call in ill too frequently." *Id.* She reported that she missed working, but was "worried about getting to anxious." *Id.* Dr. Brooks suggested she volunteer or work part time at her church or with a community organization. *Id.*

On April 17, 2012, Dr. Christopher Bovinet, D.O. ("Dr. Bovinet") completed a Medical Consultation of Ms. Christian on behalf of the Virginia Department of Rehabilitative Services. *Id.* at 365. Dr. Bovinet summarized Ms. Christian's recollection of her chief complaints: Diabetes mellitus, neuropathy, osteoarthritis, heart disease, asthma, and depression. *Id.* Regarding diabetes, Ms. Christian stated she has type two diabetes and currently takes medication to monitor it. *Id.* at 366. She also stated that she did not watch her diet until she was diagnosed with coronary artery disease. *Id.* She explained that she underwent diabetes counseling in addition to exercising by walking approximately five minutes for three to four times per day, and repeating this regimen three times per week. *Id.* Regarding neuropathy, Ms. Christian indicated she has peripheral neuropathy due to her diabetes and gets occasional tingling in her fingers and feet. *Id.* Regarding osteoarthritis, Ms. Christian stated she slipped and fell on the ice a few years ago and fractured her ankle, leaving her with present osteoarthritis in the right ankle. *Id.* Ms. Christian indicated that she takes Vicodin twice per day as well as tramadol twice per day to help with the pain. *Id.* at 367. Regarding her heart disease, Ms. Christian stated she was diagnosed with heart disease in 2008 and had an infarction in 2010. *Id.* She also stated she was going to cardiac rehabilitation after receiving both stents. *Id.* Regarding asthma, Ms. Christian stated she has shortness of breath and uses an inhaler, but denied having any recent asthma attacks. *Id.* Regarding depression, Ms. Christian stated that she was diagnosed with depression in 2010, but presently denied any suicidal ideations and has yet to see a therapist or psychiatrist but does take antidepressants. *Id.* at 368.

Ms. Christian reported to Dr. Bovinet that she was independent with most daily living activities, including dressing, bathing, feeding, and grooming. *Id.* Ms. Christian, however, mentioned that her husband helps her with buttoning, snapping, opening jars, and occasionally,

cooking and cleaning. *Id.* Upon physical examination, Dr. Bovinet reported Ms. Christian's general appearance as morbidly obese (294.4 pounds), but found she was breathing comfortably and had no difficulty getting on or off the exam table or ambulating (also indicating she used no assistive device such as a cane). *Id.* at 370. Her chest, lungs, cardiovascular system, and extremities appeared well with no issues other than the accumulation of fluid in lower extremities. Dr. Bovinet found she had a decreased ability to squat and had limited range of motion in her shoulder joints, but had normal range of motion in her elbows, hips, knees, and wrists. *Id.* at 371-72. Mentally, Ms. Christian was "awake, alert and oriented," and had a normal mood and affect. *Id.* at 370. Dr. Bovinet indicated that though Ms. Christian provided conflicting reports of the dates she received her stents, she presented with logical thought processes and recall ability.

Dr. Bovinet found that Ms. Christian, in an eight-hour workday, could stand for about six hours, walk for three hours with breaks, and sit about eight hours with an ergonomic chair. *Id.* at 373. Furthermore, Ms. Christian could carry thirty pounds occasionally and twenty pounds frequently. *Id.* Dr. Bovinet also found that Ms. Christian should be able to reach, handle, feel, grasp, and finger occasionally depending on the severity of her pain.

On April 26, 2012, Dr. James Wickham, M.D. ("Dr. Wickham") reviewed Ms. Christian's claim on behalf of the state agency and found that she was not disabled, and therefore had the ability to work. *Id.* at 82. Dr. Wickham found that Ms. Christian's depression and anxiety did not affect her ability to care for personal needs or daily activities, that medical evidence demonstrated her heart and lungs were satisfactorily functioning, that her diabetes and high blood pressure could be controlled by medication and diet, and that though she experiences

occasional pain and discomfort, the medical evidence demonstrated she could sit, stand, walk, and use her arms effectively. *Id.*

On August 1, 2012, Ms. Christian saw Dr. Brooks for a follow-up visit. *Id.* at 497. Ms. Christian reported that she had a nervous breakdown and called the Suicide Hotline two weeks prior. *Id.* at 499. She reported feeling sad "all of the time" and "thinks if she was [sic] gone things would be different." *Id.* Dr. Brooks increased Ms. Christian's Effexor prescription and also started her on Celexa; both are antidepressants to help with her suicidal ideations and anxiety.

On October 13, 2012, Ms. Christian saw Dr. Ridley with no complaints of chest pain, pressure, tightness, or shortness of breath. *Id.* at 422. Upon examination, Ms. Christian presented with gastrointestinal issues and anxiousness. *Id.* at 424. Dr. Ridley prescribed Effient and encouraged a low-sodium diet, indicating she should follow up in one year. *Id.* at 425.

On October 24, 2012, Ms. Christian completed another SSA questionnaire. *Id.* 267-76. Ms. Christian remarked, "I really feel that it's not worth getting up some days because to live in pain and not being [sic] able to live life the way you are used to is very depressing. I feel that I'm not a productive member of society." *Id.* at 276.

On December 13, 2012, Dr. Josephine Cader, M.D. ("Dr. Cader") reviewed Dr. Wickham's decision on behalf of the state to reconsider Ms. Christian's claim for disability. *Id.* at 85. Dr. Cader affirmed the state agency's previous decision, finding that Ms. Christian's condition resulted in some limitations in her ability to perform work-related activities. *Id.* at 97. However, the condition was not severe enough to keep Ms. Christian from working. *Id.*

On January 22, 2013, Ms. Christian saw Dr. Ridley with complaints of recurrent chest pains and shortness of breath. *Id.* at 450. She described the pressure as tightness that lasted

10

between ten and fifteen minutes per episode. *Id.* Dr. Ridley scheduled Ms. Christian for an echocardiogram. *Id.* at 453. On January 31, 2013, Ms. Christian followed up with Dr. Ridley presenting "without complaints of chest pain, chest pressure with chest tightness, . . . [no] shortness of breath, dyspnea on exertion, palpitations, tachycardia, syncope or presyncope." *Id.* at 445. Dr. Ridley reviewed the echocardiogram results with Ms. Christian, noting she had reduced functioning and weakness in the heart. *Id.* at 448. Dr. Ridley prescribed diet counseling and encouraged her to adjust her caloric intake to achieve an ideal body weight. *Id.*

## III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v.*

*Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that Ms. Christian did not engage in substantial gainful activity since March 25, 2010, the alleged onset date of disability. R. 31. Second, Ms. Christian had the following severe impairments: hypertension, coronary artery disease, diabetes mellitus, osteoarthritis and allied disorders, anemia, asthma, and obesity. *Id.* (citing 20 C.F.R. § 404.1520(c)). Third, Ms. Christian did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 32. The ALJ assessed the severe impairments under multiple listings, including musculoskeletal, cardiovascular, and respiratory systems, both individually and collectively. *Id.* These impairments were also considered in light of Ms. Christian's obesity. *Id.* Fourth, the ALJ found that Ms. Christian had the RFC to perform light work as defined by 20 C.F.R. 404.1567(b) with the following limitations: Ms. Christian can lift up to twenty pounds occasionally and ten pounds frequently; she can stand or walk about six hours and sit for six hours within an eight-hour workday; she must avoid climbing, exposure to respiratory irritants, extreme temperatures, and humidity; and she cannot perform work requiring constant bilateral vision and depth perception. *Id.* at 33. Fifth, while Ms. Christian is unable to perform past relevant work, the ALJ found that considering her age, education, work experience, and RFC,

there are jobs that exist in significant numbers in the national economy that Ms. Christian can perform. *Id.* at 38. The ALJ, relying on the VE's opinion, found that suitable jobs exist, including medical assistant and phlebotomist. *Id.* Therefore, the ALJ determined that Ms. Christian had not been under a disability from March 25, 2010 through November 22, 2013. *Id.* at 39.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Acting Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### A. The ALJ Properly Accounted for Ms. Christian's Mental Impairments When Making His RFC Determination.

In her first claim of error, Ms. Christian argued that the ALJ's RFC failed to account for the mental limitations documented in her medical records. ECF No. 15 at 4. Ms. Christian provided a number of reasons the ALJ's reasoning on her mental limitations was in question: First, the ALJ's description of Ms. Christian's mental health treatment was incomplete because the ALJ focused on notes from her primary care physician that indicated her mood, memory, and affect were normal and the ALJ focused on the fact that she was not seeing a therapist or a psychiatrist. *Id.* at 4-5. Ms. Christian asserted, though, that she was prescribed antidepressants in 2010 and experienced suicidal ideations, including calling the Suicide Hotline, at one time. Second, the ALJ incorrectly relied on Ms. Christian's daily living activities in his finding that her depression caused less than a minimal impairment. *Id.* at 5. And third, if Ms. Christian's mental limitations were found to be severe, then it would require that she be found disabled based upon "advanced age" and an inability to perform more than unskilled work. *Id.* at 7. The Commissioner responded, arguing substantial evidence in the record supports the ALJ's determination that Ms. Christian's mental limitations are only mild and do not limit her ability to perform work-related activities. ECF No. 17 at 11. The Commissioner also argued that Ms. Christian pointed primarily to "subjective complaints as opposed to clinical findings assessed by medical sources." *Id.* at 11 n.2. The Commissioner concluded that the ALJ's decision was supported by substantial evidence and should not be re-weighed. *Id.* at 14.

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine

a claimant's RFC. 20 C.F.R. § 404.1545(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* § 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3). "Relevant evidence . . . includ[es] information about the individual's symptoms and any 'medical source statements'—i.e., opinions about what the individual can still do despite his or her impairment(s) submitted by an individual's treating source or other acceptable medical sources." *Gautreau v. Colvin*, No. 2:15CV81, 2016 WL 1314314, at \*7 (E.D. Va. Feb. 26, 2016), *report and recommendation adopted sub nom. Gautreau v. Colvin*, No. 2:15CV81, 2016 WL 1298122 (E.D. Va. Mar. 31, 2016) (citing SSR 96–8p, 1996 WL 374184, at \*2 (July 2, 1999)). When assessing a claimant's RFC, the ALJ is to consider both severe and non-severe impairments, and any combination thereof, taking into account both objective medical evidence as well as subjective complaints of pain and limitations. 20 C.F.R. § 404 .1545(e). A severe impairment is defined as one that "significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at \*1 (July 2, 1996). "An impairment is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521. The ability to do "basic work activities" is defined as having the ability and aptitude to do most jobs. *Id.*

The ALJ specifically discussed Ms. Christian's alleged mental limitations at step three, finding that her "alleged medically determinable mental impairment of depression did not cause more than minimal limitation in [her] ability to perform basic mental work activities and was therefore nonsevere." R. 32. The ALJ considered the "four broad functional areas" in section 12.00C of the Listing of Impairments known as the "paragraph B" criteria. *Id.* These areas included: (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or

pace, and (4) episodes of decompensation. *Id.* Upon considering these four areas, the ALJ either found Ms. Christian had no limitation or merely a mild limitation, and again, these limitations would not affect Ms. Christian's ability to perform basic work activities. *Id.*

Substantial evidence in the record supports the ALJ's reasoning in regards to Ms. Christian's mental limitations when assessing her RFC. Ms. Christian testified that she goes to church twice a month, plays with her grandson, and goes out to eat with her husband, *id.* at 51-52, all of which support the ALJ's decision that she has no limitation in the social functioning area. While she testified that she has depression and anxiety attacks three to four times per week, she appeared to have normal mood, memory, affect, and judgement at nearly all of her examinations. *See, e.g., id.* at 370 (finding she was "awake, alert and oriented," and had a normal mood and affect); *id.* at 333 (finding that Ms. Christian was "oriented to person, place, and time and well-developed, well–nourished, and in no distress"); *id.* at 247 (indicating she handles stress well). According to evidence in the medical records, Ms. Christian appears to be able to concentrate for periods of time, as she is able to read a lot, and manage bills, money, and bank accounts, as well as pursue an online class. *Id.* at 60. *But see id.* at 250 (indicating that reading is hard because her eye sight is bad). When meeting with Dr. Bovinet, she was able to spell "world" backwards and was able to recall listed items read to her at various points during the examination. *Id.* at 370; *see also id.* at 248 (indicating she responds to written instructions "good," and spoken instructions, "very good"). Dr. Brooks and Dr. Ridley advised Ms. Christian that her complaints of insomnia and mild anxiety may be menopause-related. *Id.* at 332-33, 504. Further, in January of 2012, in response to Ms. Christian stating that she was worried that if she got a job she would have to call in sick too frequently, Dr. Brooks advised her that she may want to volunteer, work part time, or work at her church or with a community organization. *Id.* at 504.

In April of 2012, at her Medical Consultation with Dr. Bovinet, Ms. Christian stated that while she was diagnosed with depression in 2010, she had no present suicidal ideations and had yet to see a therapist or psychiatrist but took antidepressants. *Id.* at 368. It was not until August of 2012 that Ms. Christian reported that she had a nervous breakdown and called the Suicide Hotline, feeling sad "all of the time" and thinking that " if she was [sic] gone things would be different." *Id.* at 499. In response, Dr. Brooks increased Ms. Christian's Effexor prescription and also started her on Celexa. Finally, both state agency physicians found that Ms. Christian's depression and anxiety did not affect her ability to care for personal needs or perform daily activities. *Id.* at 82; Ms. Christian disputed the ALJ's consideration of the lack of treatment (seeing a psychiatrist or therapist), and her ability to perform daily activities when supporting his finding that her depression was only a mild limitation. ECF No. 15 at 5. However, the ALJ is permitted to consider the fact that Ms. Christian only sought a conservative course of treatment and whether it proved effective. *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996) (providing that the ALJ may consider a claimant's daily activities, as well as the effectiveness of any medication that the claimant takes and the treatment that the claimant receives for relief of pain and other symptoms). Ms. Christian was prescribed Celexa and Effexor, both antidepressants, and found no need to seek further treatment for her depression. Furthermore, regarding her daily activities, the ALJ is also permitted to consider the extent of Ms. Christian's daily activities when considering an impairment as it relates to the RFC. *See Mastro v. Apfel*, 270 F.3d 171, 179-80 (4th Cir. 2001) (holding that the ALJ properly considered the claimant's reported daily activities when evaluating her RFC); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (noting the pattern of the claimant's daily activity—cooking, washing dishes, caring for a house, cleaning— suggests that he was not disabled from working."). Therefore, the ALJ did not err in considering

the fact that Ms. Christian could read, go to church, go out to eat, take online classes, and play with her grandson. Accordingly, the undersigned finds that substantial evidence supports the ALJ's conclusion that Ms. Christian's mental limitations were non-severe at step two of the sequential evaluation process

Nonetheless, even if this were not the case, a step two error is harmless if the ALJ proceeded to the next step and considered all of the claimant's impairments, including her alleged mental limitations, when assessing her RFC. *See Kins v. Comm'r of Soc. Sec.*, No. 3:14-CV-86, 2015 WL 1246286, at *22 (N.D.W. Va. Mar. 17, 2015). Specifically, once a claimant moves beyond step two, the ALJ is required to consider the combined effects of all of the claimant's impairments, severe and non-severe, throughout the remaining steps of the evaluation process. 20 C.F.R. § 404.1523; *Cook ex rel. v. Colvin*, No. 2:11-cv-362, 2013 WL 1288156 (E.D. Va. Mar. 1, 2013). This Court has previously held an ALJ's failure to label an impairment as severe at step two to be harmless error as long as the ALJ discussed the evidence related to the impairment at subsequent steps in the evaluation process. *Cook*, 2013 WL 1288156, at *5. The ALJ in this case satisfied this requirement by referring to repeated physical examinations in which Ms. Christian reported having normal mood, memory, affect, and judgment, R. 35; by noting that Ms. Christian reported having depression and suicidal ideations but was not nervous, *id.*; and that in January of 2010 Ms. Christian reported having depression but Dr. Bovinet noted that she had a pleasant mood and appropriate affect upon examination, *id.* at 36; and in October of 2011, she was negative for depression, *id.* at 35. Accordingly, the Court agrees that while the ALJ could have been more explicit when addressing Ms. Christian's alleged mental impairments in his RFC analysis, any error on the part of the ALJ in failing to use explicit language is

harmless. *See Thornsberry v. Astrue*, No. 4:08-4075, 2010 WL 146483, at *5 (D.S.C. Jan. 12, 2010).

Here, substantial evidence supports the ALJ's conclusion that Ms. Christian's alleged depression and anxiety were nonsevere, and there was no objective evidence in the record to suggest that those alleged mental impairments had any impact, other than at the very most a "mild limitation." Therefore, the undersigned finds that the ALJ's RFC was supported by substantial evidence in the record.

**B. The ALJ Properly Accounted for Ms. Christian's Obesity and the Effects of Obesity on Her Other Impairments and in Combination with Her Other Impairments When Making His RFC Determination.**

In her second claim of error, Ms. Christian argued that the ALJ failed to evaluate the effect of Ms. Christian's obesity on her RFC in accordance with agency policy. ECF No. 15 at 7. Specifically, Ms. Christian stated, "although the ALJ evaluated whether obesity, in combination with her other impairments, established that her medical condition met or equaled a listed impairment, . . . he did not consider the effect of obesity on her other impairments when evaluating [her] RFC." *Id.* The Commissioner responded that the ALJ considered Ms. Christian's obesity both "singularly and in combination with her other impairments in assessing her work capacity." ECF No. 17 at 15.

"[T]he ALJ is required to assess the combined effect of a claimant's impairments when determining whether a claimant has a severe impairment or combination of impairments throughout the five-step analytical process." *Boston v. Barnhart*, 332 F. Supp. 2d 879, 885-86 (D. Md. Jan. 11, 2004) (citing 20 C.F.R. § 404.1523). Additionally, "As a corollary to this rule,

the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

As is the case here, the ALJ determined Ms. Christian had a number of severe impairments, including obesity, R. 31, and was thus required to consider "the combined impact of the impairments . . . throughout the disability determination process." 20 C.F.R. § 404.1523. "The combined effects of obesity with other impairments may be greater than might be expected without obesity." SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). Further, "obesity can increase the severity of coexisting or related impairments to the extent that the combination of impairments meets a listing." *Boston*, 332 F. Supp. 2d at 886 (noting also the impact of obesity on other disorders such as cardiovascular issues and sleep apnea that can lead to drowsiness and lack of mental clarity); *see generally* SSR 02-1p (discussing the effects of obesity and the overall administrative evaluation process when considering obesity).

At step three, the ALJ considered multiple listings in the musculoskeletal, cardiovascular, and respiratory systems, both individually and collectively, and as affected by Ms. Christian's obesity. R. 32. He then stated that her body mass index of 48.44 correlated to a finding of obesity and, in accordance with SSR 02-1p, the ALJ "considered [Ms. Christian's] obesity both singly and in conjunction with [her] other severe impairments," ultimately finding that she did not meet a listing. *Id.* Contrary to Ms. Christian's representation that "no statement whatsoever about Plaintiff's obesity exists in the ALJ's decision except in his step 3 analysis," ECF No. 18 at 3, the ALJ then repeated this consideration at step four when assessing her RFC. *Id.* at 35.

Though the ALJ stated that he considered Ms. Christian's obesity in combination with other impairments both at step three and step four, he did not go into detail, impairment by impairment, discussing the effects, if any, Ms. Christian's obesity has on her other impairments.

20

Summarily concluding that he considered the effects, without more, is generally not sufficient enough for this Court to find that the ALJ did in fact consider Ms. Christian's obesity in conjunction with her other alleged impairments. *See Saxon v. Astrue*, 662 F. Supp. 2d 471, 480 (D.S.C. Sept. 15, 2009) ("[A]lthough it is possible to infer from the ALJ's review of the medical evidence and his RFC evaluation that he did in fact consider the combined effect of the Plaintiff's impairments . . . the Court finds that such an *inference* falls short of the required evaluation."); *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 268 (D. Md. Sept. 5, 2003) ("Even had the ALJ applied the correct listing to plaintiff's tibial fracture, there is no evidence, other than a bald statement to that effect, that he properly considered plaintiff's extreme obesity in combination with the residuals of his tibial fracture.").

"However, an ALJ need not explicitly state that he or she has considered a claimant's impairments in combination. What matters is whether it is discernible from the ALJ's decision that he or she did so." *Jones v. Astrue*, No. 7:10CV00313, 2011 WL 1877677, at *12 (W.D. Va. May 17, 2011), *report and recommendation adopted,* No. 7:10CV00313, 2011 WL 2173917 (W.D. Va. June 2, 2011). Some courts have found that when an ALJ indirectly factors a claimant's obesity into his opinion by addressing and adopting conclusions of reviewing doctors who were aware of the obesity, remand is not required because there is no indication that an explanation of her obesity would further develop the record by means other than the medical evidence already in the record. *See McKinney v. Astrue*, No. 1:11CV199, 2012 WL 6931344, at *3 (W.D.N.C. Dec. 11, 2012), *report and recommendation adopted sub nom. McKinney v. Asture*, No. 1:11CV199, 2013 WL 300822 (W.D.N.C. Jan. 25, 2013) ("[T]he ALJ implicitly considered Plaintiff's obesity by considering the medical evidence in the record, as well as the opinions of state agency physicians who addressed Plaintiff's obesity and found it imposed no

21

additional impairments, any error in failing to explicitly mention obesity in the decision was harmless."); *cf. Williams v. Astrue*, No. 2:11-CV-107, 2012 WL 2065282, at *18-19 (N.D.W. Va. May 16, 2012), *report and recommendation adopted*, No. 2:11-CV-107, 2012 WL 2065057 (N.D.W. Va. June 8, 2012) (finding "the ALJ's failure to explicitly consider the effects of a claimant's obesity could be harmless error," but noting "the ALJ specifically stated that he had considered Plaintiff's obesity . . . [and] whether obesity had an effect on the cardiovascular and respiratory systems").[3]

The undersigned finds here that, in addition to plainly stating that he considered Ms. Christian's obesity individually and in combination with her other alleged impairments as well as noting SSR 02-1p, the ALJ addressed her obesity and the effects thereof through his evaluation of the opinions of her treating physicians and the state agency assessments. For instance, the ALJ considered Port Warwick Internal Medicine's continued treatment of Ms. Christian, finding in these records that, per the CDC Adult BMI Calculator, Ms. Christian was obese. R. 35. Again, when assessing her cardiovascular impairments and her RFC, the ALJ noted her BMI and Dr. Ridley's diagnosis of obesity in conjunction with her diagnoses of heart failure, uncontrolled hypertension, hypercholesterolemia, a prior infarction, asthma, and diabetes mellitus. *Id.* at 36. Specifically, Ms. Christian argued that the ALJ failed to account for her frequent fatigue and the significant swelling of her lower extremities and "the effect of [Ms. Christian's] morbid obesity upon them." ECF No. 15 at 8. While the ALJ did not identify what specific consequences her obesity would have on these other limitations, he clearly considered these limitations in

---

[3] Most courts remand claims like these when the ALJ completely disregards or fails to mention a claimant's obesity at all, leaving the court to infer that the ALJ failed to consider it. *See Fleming*, 284 F. Supp. 2d at 268 (finding the ALJ in error when he found the claimant's obesity to be a severe impairment at step three but failed to mention it again); *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (remanding the plaintiff's claims where the ALJ failed to adequately discuss plaintiff's borderline obesity and make sufficient findings when evaluating the combination of impairments). This is not the case here. The ALJ in Ms. Christian's case addressed her obesity at steps three and four, in addition to addressing the impairment while assessing her RFC.

conjunction with her obesity and his evaluation of the opinions from physicians who treated Ms. Christian. *See, e.g.*, R. 35 (noting her BMI at Port Warwick in conjunction with "trace edema" (swelling of the foot, leg, or ankles)); *id.* (considering medical reports from Dr. Brooks, noting her previous diagnoses of type two diabetes, hypertension, edema, hypercholesterolemia, and bilateral ankle swelling, but also noting she was in no respiratory distress with normal gait); *id.* at 36 (considering medical records from Dr. Ridley, noting Ms. Christian's obesity, heart failure, hypertension, hypercholesterolemia, bilateral edema, and other marked heart conditions); *id.* at 36-37 (noting Dr. Ridley's opinion in a follow-up after Ms. Christian's Lexiscon Nuclear Stress Test that Ms. Christian had various diagnoses in addition to "exogenous obesity").[4]

By his decision, the ALJ considered the medical opinions and records from Ms. Christian's treating physicians who provided these other diagnoses and considered her obesity with these other impairments when prescribing treatment. Moreover, "even if this Court were to find that the ALJ did not properly consider [Ms. Christian's] obesity, such error would be a harmless one because the ALJ 'relied on the opinions of doctors who were aware of the obesity.'" *Moss*, 2012 WL 1435665, at *6 (citing *Cook v. Astrue*, 800 F.Supp.2d 897, 907 (N.D. Ill. July 12, 2011)); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding that "although the ALJ did not explicitly consider [the claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions). Therefore, substantial evidence supports the ALJ's determination regarding Ms. Christian's functional limitations in that the undersigned

---

[4] Further, some courts require a claimant to "specify how the obesity (1) limits his or her functioning and (2) exacerbates his or her impairments." *Moss v. Astrue*, No. 2:11-CV-44, 2012 WL 1435665, at *6 (N.D.W. Va. Apr. 25, 2012). Ms. Christian herself presented no evidence that her obesity limits her functioning or exacerbates her other impairments other than citing other limitations commonly related to obesity, such as swelling of her lower extremities and fatigue. ECF No. 15 at 8. Without further evidence on behalf of Ms. Christian, it is unlikely the ALJ would be able to make such a finding. Absent such evidence, the ALJ would have had to have to theorized, with medical knowledge, how obesity would affect each of her limitations specifically. *Williams*, 2012 WL 2065282, at *18 ("Plaintiff has not specified how his obesity limits his functioning and exacerbates his impairments. Instead, Plaintiff has only stated that his obesity affects his cardiovascular and musculoskeletal impairments.") (internal citations omitted).

finds the ALJ properly considered Ms. Christian's obesity in combination with her other alleged impairments and the effect of her obesity on said impairments.

## C. The ALJ Appropriately Accounted for Ms. Christian's Diabetes and Osteoarthritis and Allied Disorders in His Assessment of Her RFC.

As a third claim of error, Ms. Christian argued that the ALJ failed to "meaningfully account" for her diabetes, and osteoarthritis and allied disorders in the RFC and hypothetical to the vocational expert ("VE"), and failed to explain how these limitations were consistent with finding that Ms. Christian could lift up to twenty pounds and stand or walk for six hours on a regular basis. ECF No. 15 at 9. In response, the Commissioner argued that Ms. Christian's argument was "unpersuasive" because the ALJ specifically considered Ms. Christian's subjective complaints concerning her hands and feet to the extent they were "credibly supported functional limitations." ECF No. 17 at 15. The Commissioner also noted that the record did not support any greater functional limitation than as provided for in the ALJ's RFC based on the objective medical evidence. *Id.* at 16.

Again, the determination of a claimant's RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3). It is not this Court's role to re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the ALJ, but rather, only to see if there is substantial evidence, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. 389, 401 (1971). Here, the record provides substantial evidence to support the ALJ's

findings that Ms. Christian can lift up to ten pounds frequently and twenty pounds occasionally, and stand or walk for six hours on a regular basis.[5]

Ms. Christian cited many of the same medical records the ALJ referred to when assessing her RFC, but instead emphasized the findings as supportive of her allegations. She also referred to specific subjective complaints of pain and functional limitations that the ALJ found were not fully credible. The Court finds no error, though, in the ALJ's assessment of this evidence and conclusion of her physical abilities. *See Myrick v. Colvin*, No. 7:12-CV-359-FL, 2014 WL 1331205, at *5 (E.D.N.C. Jan. 22, 2014), *report and recommendation adopted*, No. 7:12-CV-359-FL, 2014 WL 1327137 (E.D.N.C. Mar. 31, 2014) (finding no error in the ALJ's analysis when the ALJ and the plaintiff cited the same records but emphasized different viewpoints). The Court instead finds substantial evidence supports the ALJ's determination and declines to reweigh the evidence.

The ALJ took into consideration Ms. Christian's type two diabetes, osteoarthritis, and allied disorders in evaluating her RFC. While these conditions may be connected to joint pain, stiffness, back pain and peripheral neuropathy, which resulted in functional limitations concerning her hands and feet, as the Plaintiff contends, such conditions were accounted for in

---

[5] Regarding the weight Ms. Christian can lift and/or carry, the ALJ gave "little weight" to the state agency physician's opinion that Ms. Christian could carry up to thirty pounds occasionally and twenty pounds frequently, and lift up to fifty pounds occasionally and thirty pounds frequently, noting that "the record shows [Ms. Christian] is more limited than what was found in the consultative examination." R. 36. The ALJ then gave "substantial weight" to Dr. Cader's decision at Ms. Christian's Physical Residual Functional Capacity Assessment, noting that Ms. Christian could lift or carry twenty pounds occasionally and ten pounds frequently, in addition to being able to stand, walk, or sit for six hours in an eight-hour workday. *Id.* at 37.

The ALJ also considered Ms. Christian's subjective complaints, considering both her testimony at the hearing as well as the Function Reports Ms. Christian filled out. *Id.* at 34. The ALJ did not find Ms. Christian's testimony and functional limitations to be as limited as she complained given the objective medical evidence and her wide range of activities of daily living, and therefore found her allegations of disability not fully credible. *Id.* The Court finds that the ALJ provided an explanation on the state agency opinions he relied on as well as his credibility determination of Ms. Christian's subjective complaints when assessing her RFC. *Cf. Holley v. Colvin*, No. CIV.A. 6:13-2704-BHH, 2015 WL 128595, at *13 (D.S.C. Jan. 9, 2015) (stating the necessity of the ALJ to articulate reasons for not including the manipulative restrictions found by the state agency physicians, despite giving the opinions significant weight).

the ALJ's restrictions regarding lifting/carrying/pushing/pulling demands and postural limitations of light work. He also limited her activities by finding that she must avoid climbing ladders, ropes, and scaffolds, and limited her standing/walking or sitting in an eight-hour workday. *Id.* at 33. Given the ALJ's assessment of Ms. Christian's credibility regarding these complaints,[6] substantial evidence supports the ALJ's determination that his described limitations accounted for these impairments, and limitations are substantially justified by the objective medical evidence in the record.

For example, her diabetes, which was present before she stopped working, appears to be well controlled with medication and could be managed with diet and exercise. *See id.* at 82 (denying DIB at the initial level of review upon finding, *inter alia*, that her "diabetes and high blood pressure may be treated by medication and diet"); and *id.* at 316 (noting she had a history of diabetes mellitus since before 2009). Neither her testimony nor her medical records indicate that she had any limitations in her ability to work due to her diabetes other than ancillary neuropathy. *Id.* at 49. In September of 2011, Ms. Christian had no fractures or dislocations in her back or ankle, but had mild arthritis in her back and soft tissue swelling in her ankles. *Id.* at 554-58. In November of 2011, Ms. Christian had a normal range of motion in the neck, normal gait, and no tenderness. *Id.* at 333. In December of 2011, Ms. Christian reported having pain in her lower back, neck, knees, right hip and ankle, hands, and right elbow, but also indicated that this pain is treated with medications, specifically indicating that she takes Tramadol four times per day, Vicodin two times per day, and another pain killer. *Id.* at 243. Activity wise, Ms. Christian walks around the house or cooks and cleans when she is having a good day, buys food, clothes, and household items online and manages bills, money, and bank accounts. *Id.* at 246-48.

---

[6] E.g., *Compare* her claim that she has difficulty holding things or unscrewing caps, R. 49, *with* her examination demonstrating good grip strength and full motor strength, R. 371-72.

In January of 2012, Ms. Christian complained to her treating physician, Dr. Brooks, that she had congestion, headaches, and leg and hip pain. *Id.* at 504. Dr. Brooks, after physically examining Ms. Christian, suggested she volunteer or work part-time at her church or with another community organization. *Id.* Dr. Brooks' suggestions imply that Ms. Christian's pain does not limit her from performing basic work activities. Consequently, Ms. Christian's aforesaid impairments, based on substantial evidence, were accounted for in the ALJ's RFC. *See Price v. Barnhart*, No. 7:04cv741, 2005 WL 3477547, at *6 (W.D.Va. Dec. 13, 2005) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1458 (4th Cir. 1990)) ("The mere diagnosis of a condition is not conclusive; any impairment must be accompanied by functional limitations that render the claimant unable to work."); *Barnwell v. Colvin*, No. 4:13-CV-00019, 2014 WL 3890442, at *17 (W.D. Va. Aug. 7, 2014) ("[T]he ALJ must account for all of the limitations caused by the claimant's treatment in assessing the claimant's RFC."); *Hall v. Harris*, 658 F.2d 260, 265-66 (4th Cir. 1981) (explaining that an ALJ's decision that a claimant can sit, stand, or walk for a period of time is supported by substantial evidence when the ALJ considers claimant's testimony, objective medical evidence in the record, state agency physician determinations, and the claimants non-exertional limitations to complete substantial gainful employment); *cf. Rockelli v. Comm'r, Soc. Sec. Admin.*, No. CIV. SAG-10-2670, 2013 WL 119764, at *2 (D. Md. Jan. 8, 2013) (finding the ALJ's determination not to include hand-related limitations in the RFC was supported by substantial evidence because most of the hand-related limitations came from the claimant's subjective complaints, which were determined by the ALJ not to be credible, and a doctor's report that was afforded little weight); *Hodge v. Astrue*, No. 3:10-CV-1419, 2012 WL 589984, at *23 (S.D.W. Va. Feb. 22, 2012) (explaining that the claimant need not be able to

perform every occupation classified as light work in order for the ALJ to find her capable of substantial gainful activity within the light exertional classification).

Ms. Christian also argued that the ALJ failed to account for her diabetes and osteoarthritis and allied disorders when questioning the VE. ECF No. 15 at 10. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record." *Walker*, 889 F.2d at 50. The hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe, *Benerate v. Schweiker*, 719 F.2d 291, 292 (8th Cir. 1983); *Carter v. Apfel*, No. 5:97-600, 2001 WL 40795 (S.D. W. Va. Jan. 17, 2001), as it is the duty of the ALJ to "insure that the record contains sufficient evidence upon which to make an informed decision," *Blankenship v. Astrue*, No. 3:11-CV-00005, 2012 WL 259952, at *13 (S.D.W. Va. Jan. 27, 2012); *McPherson v. Astrue*, 605 F.Supp.2d 744, 761 (S.D.W.Va. Mar. 2, 2009) ("It is not necessary that the hypothetical mention the underlying diagnoses . . . what is important is that the VE is presented with an accurate picture of the Plaintiff's limitations."). The ALJ posed a hypothetical consistent with those limitations the ALJ found both credible and supported by objective medical evidence in the record, and those limitations accounted for Ms. Christian's severe impairments, including diabetes and osteoarthritis.

## D. The ALJ's RFC Was Not Inconsistent with His Finding That She Had Class II-III Heart Failure.

As a fourth claim of error, Ms. Christian argued that the ALJ's finding in his RFC assessment that she could stand and walk six hours at a time and lift up to twenty pounds on a regular basis was inconsistent with his finding she had class II-III heart failure. ECF No. 15 at

11. In response, the Commissioner argued that the ALJ's RFC assessment was supported by substantial evidence in the record, as the ALJ considered "relevant diagnostic evidence, objective clinical evidence found on examinations, the medical opinion evidence, and other evidence such as [Ms. Christian's] activities. . . ." ECF No. 17 at 16. As stated above, *supra* sub-section C, this Court will not re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the ALJ. This Court's role is to ensure that the ALJ's conclusion is supported by substantial evidence in the record.

Substantial evidence in the record supports the ALJ's determination that Ms. Christian can perform light work even with class II to III heart failure. After finding that Ms. Christian's heart failure was a severe limitation, R. 31, the ALJ discussed the impact her heart failure had on her ability to perform work, *id.* at 33. The ALJ considered Ms. Christian's subjective limitations, including her allegations that she could only stand for five minutes and sit for twenty minutes, and lift a two-liter bottle of soda, but not a gallon of milk. *Id.* The ALJ also considered her function reports and daily activities, *id.* at 34, but, after considering the evidence in the record, the ALJ found Ms. Christian's statements concerning the intensity, persistence, and limiting effects of her symptoms "credible only to the extent of the established [RFC]. . . ," *id.* at 37.

Specific to her heart failure, the ALJ considered Ms. Christian's records from Hampton Roads Cardiology ("HRC") between September 15, 2011 and January 31, 2013. *Id.* at 36. At HRC, Dr. Ridley performed an electrocardiogram, which revealed that Ms. Christian had a normal heart rate with an abnormal T-wave. *Id.* Dr. Ridley categorized Ms. Christian's heart failure as class II-III, noting she had arteriosclerotic coronary artery disease, had three stents inserted, and had a prior infarction (heart attack). *Id.* The ALJ indicated that the class II-III heart failure resulted in "greater than mild[,] but less than marked symptoms," and found this

classification to be consistent with both the objective medical evidence and the claimant's subjective complaints. *Id.* On the other hand, the ALJ also considered Ms. Christian's consultative examination with Dr. Bovinet on April 14, 2012. *Id.* at 35. Dr. Bovinet found Ms. Christian to be breathing comfortably with clear lungs and a regular heart rate and rhythm. *Id.* at 36. Ms. Christian got on and off the examination table without difficulty, ambulated without difficulty, walked with a strong, balanced gait (no assistive device), and moved her upper extremities in a full range of motion. *Id.*

The ALJ also considered the results from a Lexiscan Nuclear Stress Test (a test that measures blood flow to one's heart) performed in January of 2013, which showed "an abnormal study with large moderate to severe area of ischemia/infarction in the distal, anterior, inferior, and apical segments, with wall motion abnormalities, and an ejection fraction of 41%." *Id.* at 36. The ALJ also considered another echocardiogram that showed "mildly reduced left ventricular systolic function, an ejection fraction of 43%, apical hypokinesis, mild left atrial dilation, mild concentric left ventricular hypertrophy, [and] trace mitral regurgitation." *Id.* The next month, Ms. Christian returned for a follow-up with "no complaints of chest pain, chest pressure/tightness, shortness of breath, dyspnea upon exertion, palpitations, tachycardia, syncope, or presyncope." *Id.* at 37. Ms. Christian also reported "occasional walking" and had "a regular heart rate and rhythm, without murmurs, gallops, cardiomegaly, or thrills." *Id.*

According to Ms. Christian's Physical Residual Functional Capacity Assessment completed by Dr. Cader, a Disability Determination Services affiliated physician, Ms. Christian could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand/walk for six hours and sit for six hours in an eight-hour workday. *Id.* The ALJ gave substantial weight to Dr. Cader's opinion, finding that it was largely supported by the record. *Id.*; *see also* 20 C.F.R. §

404.1527(e) (2)(i) ("[A]dministrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled."); *Harman v. Colvin*, No. CIV.A. 6:13-1728-TMC, 2014 WL 4722201, at *2 (D.S.C. Sept. 19, 2014), *aff'd sub nom. Harman v. Comm'r Soc. Sec. Admin.*, 611 F. App'x 791 (4th Cir. 2015) ("[A]lthough ALJ's are not bound by findings made by a state agency medical physician, a state agency physician's opinion must be considered as an opinion of a highly qualified physician who is an expert in disability claims under the SSA.").

Simply because Ms. Christian is classified as having heart failure, does not automatically categorize her as unable to perform work. Heart failure classifications are specific to each individual and can even fluctuate over an individual's lifetime. A district court in South Carolina summarized the general classification system for heart failure as it affects a person's activity:

> According to the American Heart Association ("AHA"), the most commonly used classification system for heart failure is the New York Heart Association ("NYHA") Functional Classification, which places patients in one of four categories based on how much they are limited during physical activity. Under this classification, Class I heart failure encompasses "[p]atients with cardiac disease but resulting in no limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea or anginal pain." Class II heart failure encompasses "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." Class III heart failure encompasses "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." Class IV heart failure encompasses "[p]atients with cardiac disease resulting in inability to carry on any physical activity without discomfort. Symptoms of heart failure or the anginal syndrome may be present even at rest. If any physical activity is undertaken, discomfort increases."

*Foster v. Colvin*, No. CIV.A. 6:13-926-TMC, 2014 WL 3829016, at *3 n.1 (D.S.C. Aug. 4, 2014). The proper approach for an ALJ is to consider the classification as it relates to the claimant's ability to carry out any physical activity, including the claimant's comfort while performing that activity. *Id.* at *9 (finding the ALJ's consideration of the plaintiff's physical and daily activities a proper consideration to rebut the general class II heart failure symptoms that show fatigue, palpitation, or dyspnea). As noted above, the ALJ considered Ms. Christian's physical abilities, both objectively based on her medical records and subjectively based on her complaints of pain and discomfort. The above cited record provides substantial evidence to support the ALJ's RFC assessment.

## VI. <u>RECOMMENDATION</u>

For these reasons, the undersigned **RECOMMENDS** that Ms. Christian's motion for summary judgment, ECF No. 14, be **DENIED**; the Defendant's motion for summary judgment, ECF No. 16, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## VII. <u>REVIEW PROCEDURE</u>

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this report and recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. The United States District Judge shall make a de novo determination of those portions of this report and recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this report and recommendation to the all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Newport News, Virginia
May 6, 2016